**GENERAL ELECTRIC CREDIT CORPORATION, Plaintiff–Appellant,**

v.

**STRICKLE PROPERTIES, Ray Lyle and T.P. Strickland, Defendants–Appellees.**

No. 88–8162.

United States Court of Appeals, Eleventh Circuit.

Dec. 21, 1988.

---

Douglas D. Salyers, Troutman, Sanders, Lockerman & Ashmore, Rutledge Q. Hutson, Atlanta, Ga., for plaintiff-appellant.

James H. Phillips, McCamy, Phillips, Tuggle, Rollings & Fordham, Dalton, Ga., for defendants-appellees.

David G. Archer, Archer & Howell, Cartersville, Ga., for Strickland.

Before HILL and FAY, Circuit Judges, and DAVIS[*], District Judge.

EDWARD B. DAVIS, District Judge:

This appeal arises from a decision of the District Court granting judgment in favor of Appellant General Electric Credit Corporation (hereinafter "GECC") on its contract claim. The District Court granted judgment after a bench trial and the submission of stipulated facts. The Court entered a judgment for GECC in the amount of $34,146.72. GECC, however, had been seeking $282,011.35 in damages, plus prejudgment interest and attorneys' fees. This appeal ensued.

## FACTS

In 1984, Strickle Properties, Ray Lyle and T.P. Strickland (hereinafter "Appellees") were the three stockholders of Benchmark Carpet Mills, Inc. (hereinafter "Benchmark"). Strickle Properties was a partnership formed by Lyle and Strickland. Strickle also leased to Benchmark much of the equipment used in the daily operations of the mill.

On October 1, 1984, Appellees entered into a Purchase and Sale Agreement with

---

[*] Honorable Edward B. Davis, U.S. District Judge for the Southern District of Florida, sitting by designation.

BMK Holding Company (hereinafter "BMK") wherein BMK agreed to purchase all of the stock and certain assets of Benchmark. During negotiations, Appellees learned that GECC was loaning the funds to BMK to purchase Benchmark and to infuse it with new capital. Indeed, on October 1, 1984, BMK also entered into a loan and security agreement with GECC which gave GECC a first priority security interest in all BMK assets. GECC is a party in interest in this litigation pursuant to that agreement.

Paragraph 7(q) of the Purchase and Sale Agreement contained an important warranty common in such transactions:

> All of Sellers' [Appellees] tax returns required to be filed *have been properly prepared and filed* with the appropriate federal, state and governmental agencies and Sellers have paid all taxes, penalties, interest, assessments and deficiencies shown to be due on such returns. No proposed additional but unassessed taxes, penalties or interest have been asserted, other than those for which adequate reserves have been made on the books of the Sellers. *The Sellers' returns have not been audited for years since 1981.* Copies of Sellers' Federal income tax returns for the two most recent fiscal years as filed with the Internal Revenue Service have been previously delivered to the Buyer. In the event any such taxes, penalties, interest, assessments or deficiencies are due, *Sellers shall pay the same directly to the appropriate taxing authority immediately upon their receipt of notification* from such authority or Buyer that the same is due ... (emphasis added)

In Paragraph 13(b) of the agreement, Appellees further agreed to indemnify BMK for any and all losses incurred by BMK as a result of the Appellees' breach of any warranties or of the contract.

On October 12, 1984, the deal was closed. BMK executed two subordinated secured promissory notes, one in the amount of $319,352.00 in favor of Lyle, and one for $2,363,205.00 in favor of Strickland. At that time, Appellees entered into a Subordi-

nation Agreement with GECC wherein they agreed to subordinate their interests in BMK's assets to those of GECC.

In the promissory notes, the parties provided for the possibility that BMK would have earnings difficulties. In Paragraph 1(b), they provided that

> Notwithstanding the foregoing, the amounts payable on the Notes as described above may be deferred depending upon the earnings of the Company, as hereinafter described ...

The parties, however, went on to provide in Paragraph 1(e) that

> Interest on deferred portions of Note Installments past due shall be paid January 2 of the year following deferral at 9 percent per annum until the installment is not in arrears.

The Subordination Agreement between the parties to this litigation further provided that, notwithstanding any contrary provisions in the Subordination Agreement, Appellees could demand and receive payments due under the subordinated notes on an unaccelerated basis. *Exhibit B to the Subordination Agreement.* But, the parties also agreed that the right to receive payment was terminated by an "Event of Default." Insolvency was one of the enumerated events of default. *Loan Agreement* at ¶ 11.1(K).

On October 15, 1984, BMK and Benchmark merged, with Benchmark being the surviving corporation. The company ran into financial difficulty, and Benchmark properly deferred payments on the notes. Benchmark also, however, deferred payment of the interest due on the deferred amounts. The District Court calculated that by May 2, 1986, when an involuntary bankruptcy petition was filed against Benchmark, $32,305.58 in interest had been deferred.

On December 12, 1985, the Internal Revenue Service, pursuant to an audit, assessed Benchmark additional taxes for the tax years 1982 and 1983. The assessments were made because Appellees had underreported Benchmark's income in those years. Part of this underreporting stemmed from

excessive deductions for officers' salaries in 1982 and 1983.

On December 16, 1985, Benchmark notified Appellees that the assessments had been made. Appellees refused to pay, and continued to do so throughout the litigation. On February 21, 1986, the IRS notified Benchmark that additional penalties and interest had been assessed for the 1982 and 1983 tax years. Faced with this prospect, Benchmark paid the IRS $65,654.38 in cash for taxes, penalties and interest for the year 1982. Benchmark also paid $216,-356.97 for taxes, penalties and interest for 1983. Of that amount, the $46,052.97 in penalties and interest was paid in cash, while the $170,304.00 of additional taxes was paid by way of a 1985 carryback loss refund. Benchmark subsequently recouped the $45,257.00 in taxes for 1982 also by way of a 1985 carryback loss refund. Benchmark, therefore, was out-of-pocket for $66,450.30 in penalties and interest, and had used $215,561.00 of its carryback loss to pay for the back taxes. The bankruptcy petition was filed on May 2, 1986, and on June 24, the bankruptcy court granted GECC leave to pursue appropriate litigation.

GECC brought this suit seeking reimbursement of all funds paid to the IRS for tax years 1982 and 1983. The District Court concluded that GECC was only entitled to the actual out-of-pocket expenses; thus, the Court acknowledged the $66,-450.30 paid in penalties and interest. Against this amount, however, the Court offset the $32,303.58 in interest due the Appellees. As such, the District Court entered its judgment in favor of GECC for the sum of $34,146.72.

## DISCUSSION

### Loss Carryback

■ GECC raises several issues. Foremost among these is the Court's decision to simply limit the damages to the penalties and interest imposed by the IRS. The District Court relied on the fact that Benchmark had a large operating loss for the 1985 tax year. Indeed, Benchmark received a refund of all taxes paid in 1984, 1983 and 1982 by virtue of carrying back the 1985 loss. Moreover, the evidence at trial showed that Benchmark could not utilize all the loss available to it from 1985. As such, the District Court concluded that Benchmark was not damaged by virtue of Appellees' failure to pay the tax assessments. In fact, the District Court reasoned that a different holding might result if Benchmark had been required to utilize all the 1985 loss for the two tax years and had been precluded from using the loss in other years. Presumably, the damage then would have been the potential refunds lost by virtue of exhausting the 1985 loss. The District Court clearly focused on out-of-pocket loss.

The lower court's opinion, unfortunately, overlooks the dual nature of the damages in this case. There is no question that Benchmark had to spend $66,450.30 of its own cash reserves for penalties and interest, and is, therefore, injured. Benchmark, however, also had a contractural expectation that has been breached. First, Appellees specifically warranted that the company they were selling had no tax liability. The lack of tax liability unquestionably played a role in BMK's decision to purchase Benchmark, particularly in light of the carryback loss provisions of the Internal Revenue Code. As sophisticated entities, both sides recognized that the ability to apply losses to previous tax years and thus acquire cash is an important component of a company's valuation. This explains why Appellees specifically provided in the contract that the 1982 and 1983 tax returns had not been audited, and that they would pay any deficiencies. This essentially guarantees the lack of tax liability and the ability to profit from the application of carryback loss.

Had Appellees properly prepared their tax returns in 1982 and 1983, Benchmark would have received a refund in 1986. Rather than simply recouping the $215,-561.00 it paid out, Benchmark would have actually realized a net gain of $215,000. In other words, if Appellees had paid their full taxes in 1982 and 1983, Benchmark would

have had $215,000 more in its pocket in 1986.

The analysis does not end there. In addition to warranting the 1982 and 1983 returns, Appellees also unconditionally promised to pay any new assessments for those years directly to the IRS and immediately upon notification. The IRS notified Benchmark, which in turn notified the Appellees, in December, 1985. Appellees refused to pay. Had Appellees paid the $215,000 then or shortly thereafter, no penalties or interest would have been assessed. More importantly, when Benchmark carried back its 1985 loss, it would have received a net refund of $215,000. Appellees' breach of the promise to immediately and directly pay the IRS ultimately denied Benchmark $215,000 in lost refunds.

It is important to note that the above analysis is not dependent on whether the 1985 carryback loss was exhausted. Equally irrelevant is Appellees' argument that a tax return is never final until all applicable statutes of limitations have expired. Appellees contractually obligated themselves to pay additional assessments directly to the IRS. Pursuant to the purchase and sale agreement, Benchmark had a right to expect that any future tax loss could be used to reap tax refunds from previous years. It was not part of the bargain that the tax loss would be used to pay additional tax assessments, and the parties clearly foresaw this in providing that Appellees would pay the tax authority directly for any additional assessments.[1] Appellees should not now be allowed to come to court and claim that the availability of the 1985 loss eradicates their duty to pay the tax. Appellees' argument is particularly troubling since they seek to apply a loss incurred after they sold the company to taxes incurred while they still operated it. This would clearly defeat the bargain reached between the parties when the company was sold in 1984.

The proper result is that Benchmark, and therefore GECC is entitled to the $282,011.35 representing additional taxes, penalties and interest for 1982 and 1983.

*Setoff*

■ GECC also challenges the lower court's decision to set off the $32,000 in interest owed Appellees. The District Court concluded, based on the evidence presented, that Benchmark went into default only as of the date that the involuntary petition in bankruptcy was filed—May 2, 1986. As such, Benchmark owed to Appellees the interest on the deferred payments for 1984 and 1985. GECC insists that the default occurred as early as November 1985 because, as one witness testified, Benchmark was not paying trade creditors. The District Court acknowledged this testimony in its order, but also pointed out that the same witness contradicted herself and actually testified that Benchmark was receiving money to pay its creditors. The District Judge concluded that there was no evidence of a firm date of default other than the date of the filing of the bankruptcy petition. This Court will not disturb that finding.

This Court is troubled by the amount of the setoff. The promissory note specifically provides that the interest on the deferred portions shall be paid January 2 of the year following deferral at 9 percent per annum. Pursuant to the note, the first installment of principal was due on January 2, 1985. The lower court acknowledges that the installment was properly deferred. This would mean that the interest was due the year following—on January 2, 1986. The District Court calculated that amount at $10,373.76. This amount was properly set off.

The problem lies in the following year. The second installment of principal was due, as the District Court acknowledges, on January 2, 1986. This payment was also appropriately deferred. Pursuant to Paragraph 1(e) of the note, this would mean

1. It is also important to note that with regards to tax year 1981, Appellees specifically provided in the contract that they had set aside adequate reserves on the books to pay for the assessments resulting from the IRS' audit of that year. This further exemplifies the importance of warranting the lack of tax liability.

that the interest was payable one year later, on January 2, 1987. The District Court determined that $21,929.82 would be due as interest on the deferred second installment. The bankruptcy petition, however, was filed on May 2, 1986, exactly seven months before that interest was due. Appellees should not be allowed to set off this second amount.

The $21,000 was due and payable on January 2, 1987. Paragraph 14 of the Subordination Agreement specifically provides that Appellees can set off amounts due under the subordinated notes, but only in an amount equal to the payment that Appellees were entitled to receive on the date of the setoff. In this case, the date of the setoff is no later than May 2, 1986. Paragraph 2 of Exhibit B to the Subordination Agreement also establishes the right to receive unaccelerated payments. But this right to receive payments is specifically terminated by an "Event of Default", as defined in the Loan Agreement. Both sides agree that the filing of the involuntary petition is an "Event of Default" pursuant to the Agreement. The right to receive payment, therefore, was cut off as of May 2, 1986. On that day, Appellees were not entitled to set off the $21,000, since that amount was not due until January 2, 1987.[2]

Appellees claim that the language in the promissory note is ambiguous and should be construed against GECC. This Court, however, finds Paragraph 1(e) to be very clear in providing for payment of interest one year after deferral. Likewise, the Subordination Agreement clearly provides that any rights to payment or setoff are terminated by events of default like insolvency. The interest on the second installment was not due until January 2, 1987, and the right to that payment has been terminated by the involuntary petition. Appellees, therefore, are only entitled to a setoff in the amount of $10,373.76.

**2.** As further support for this proposition, it is important to observe that Appellees are not seeking to set off interest that would be due on

*Prejudgment Interest*

The final issue raised by GECC is whether it is entitled to prejudgment interest. Appellees acknowledge that under Georgia law, if a sum is liquidated, prejudgment interest accrues from the date of demand at a rate of 7 percent per annum. O.C.G.A. §§ 7–4–15 and 7–4–21. Under Georgia law, a liquidated demand is "an amount certain and fixed .... a sum which cannot be changed by proof." *First National Bank v. State Highway Department,* 219 Ga. 144, 132 S.E.2d 263, 266 (1963). On February 21, 1986, when Benchmark paid the amounts due to the IRS, the amount of the damages was certain and fixed. Although GECC argues that the sum was certain as of December, 1985, the fact is that Appellees only owed the money to the IRS on that date. It was only when Benchmark paid the IRS that it incurred damages. Even the amount of the setoff was certain. On that day, Benchmark was entitled to $282,011.35, and the Appellees were entitled to set off $10,-373.76. Thus, as of February 21, 1986, Benchmark was entitled to $271,637.59. Prejudgment interest should be calculated from that date.

## CONCLUSION

The Order of the District Court granting judgment in favor of GECC is MODIFIED and the case is REMANDED for the entry of a Final Judgment in accordance with this opinion.

January 2, 1988 or 1989. These are also clearly cut off by the bankruptcy petition.