A89A0687, A89A0688. HOME INSURANCE COMPANY v. NORTH RIVER INSURANCE COMPANY; and vice versa.
(385 SE2d 736)

McMurray, Presiding Judge.

Plaintiff North River Insurance Company and defendant The Home Insurance Company provided policies of liability insurance to Intex Products, Inc. ("Intex"), a South Carolina chemical company. The defendant's policy provided "primary coverage to Intex, which coverage included a duty to defend any lawsuits against Intex at the expense of the defendant. The plaintiff's policy was an "umbrella" or "excess" policy which protected Intex against adverse judgments in amounts exceeding the primary coverage up to a limit of ten million dollars. The plaintiff's policy required, and Intex warranted to plaintiff, that certain types and amounts of primary coverage be maintained by Intex, including products liability coverage in an amount of $500,000 for each occurrence.

In 1978 Intex sold several drums of an industrial solvent to Dia-

mond Manufacturing Company ("Diamond'). Diamond used the solvent to clean the fuel tanks of a tugboat, which was being repaired in Diamond's shipyard. On December 26, 1978, a cleaning crew of Diamond employees was overcome by fumes from the solvent. Additional employees breathed the fumes while rescuing the cleaning crew. Twenty-six persons received medical attention as a result of the incident.

Intex notified defendant of the incident on the tugboat via an "Acord" form. The form had been prepared and typed by the independent insurance agent which had obtained the coverage for Intex. The Acord form bore in the space labeled "Bodily Injury" the notation "500,000" and underneath that figure the notation "1,000,000," and following those figures the typed words "Products Liability."

When the Acord form reached defendant's regional office in Charlotte, North Carolina, an experienced claims supervisor attempted to verify defendant's coverage by checking the Acord form against the policy "daily." The "daily" is an abbreviated memorandum of the provisions of an insurance policy from which the entire contact can be reconstructed. The "daily" consists of the declarations page, including a list of the standard forms of clauses which make up a policy, and duplicates of any schedule, lists or other writings which are unique to a particular policy.

When defendant's claims supervisor examined the "daily" for the policy issued to Intex he saw the figures 500,000 and 1,000,000, and concluded that the figures on the Acord form were correct, that is that the policy issued by defendant to Intex provided coverage of $500,000 for each person to a maximum of $1 million for each accident injuring more than one person. The claims supervisor did not notice that the language of the daily specified that $500,000 was the maximum available for any particular incident or "occurrence," or that $1 million was the aggregate amount available for all occurrences during the policy period. The claims supervisor filled out a "Clerical Instruction Sheet" to show the limits as "500/1000" and checked the "yes" blank on the form in the space labeled "Daily Report Available." A typist then opened a claims file and typed the word "Daily" on defendant's form No. 10-800. That word signaled any defendant' employee who later looked at the form that the coverage shown had been verified against the daily.

Near the end of 1980 three Diamond employees filed lawsuits in federal court against Intex alleging severe personal injuries from breathing the toxic fumes on the tugboat. These three product liability suits sought a total of $4 million for physical and psychiatric injuries. Intex sent the suit papers to its independent insurance agent which in turn sent the complaints to plaintiff and defendant, along with Acord forms.

When the suit papers reached defendant's regional office they were referred to R. M. Morgan, an assistant claims manager. Morgan looked at the Form 10-800 which had been typed in 1979 and saw that the limits were "500/1000" and that the coverage had been verified against the "daily" (in 1979). Because the complaints in federal court were asking for an amount in excess of what Morgan understood defendant's coverage limits to be, Morgan wrote Intex, warning that defendant's policy "affords coverage in the amount of $500,000 for each person to a maximum of $1,000,000 for each accident of more than one person. . ." Morgan's letter directed attention to the amount of the claims asserted in the federal lawsuit and recited that it was Intex's "right and privilege to engage counsel, at your expense, to protect your uninsured interest in this litigation." Although Morgan did not know when he wrote the letter whether Intex had excess coverage or not, he also stated that, "If you have policies (sic) available to you under any other insurance policies, it is suggested that you report this matter to such other company. . . ." Morgan sent a copy of his letter to Intex's independent insurance agent and the agent sent a copy of Morgan's letter and the Acord form to plaintiff.

While plaintiff's claims representative had developed an initial impression, from the Acord form and from figures given on the telephone by defendant's Savannah office, that a million dollars coverage was available for the three claims, this conclusion was reinforced by the receipt of the copy of defendant's letter by Morgan reciting policy coverage in that amount. Plaintiff relied on Morgan's excess letter and on defendant's other assertions. Plaintiff twice examined defendant's claims files which contained the false information as to coverage. Defendant's strategy and course of conduct, including the action of its attorney in the federal litigation, continuously reflected defendant's false assertion about its coverage limits.

During discovery in the federal cases, plaintiff monitored the litigation and periodically prepared detailed evaluations of the damages in each claim in view of the developing medical evidence. While plaintiff's claims personnel had some concern that adverse verdicts might exceed defendant's purported limits of $1 million and thus involve exposure to plaintiff's coverage, plaintiff did not attend settlement conferences in the federal cases since settlement demands were within the purported primary limits. Thus lulled into a passive posture, plaintiff took no active part in the defense or settlement negotiations concerning the federal cases and allocated a reserve of only one dollar for each claimant.

Meanwhile, the three federal cases progressed with jury selection being scheduled for August 27, 1981, and the trial of the first case was to begin on September 2, 1981. On August 7, 1981, the attorney employed by defendant to represent Intex recommended that he be

given authority to offer $600,000 in settlement of the three claims. On August 26, 1981, defendant's claims committee decided to authorize $400,000 in settlement of the claims, but directed that the offer not be extended until the three claimants' settlement demands were reduced.

At the time defendant's claims committee met it was anticipated that the three federal cases would be tried separately. However, following jury selection the federal judge announced that the three cases would be consolidated for trial. This precipitated a warning from the attorney retained to represent Intex that such constituted a major change, making defeat even more likely than before, since each victim's account of his emotional and physical injuries would gain credence from the fact that the other claimants were similarly injured. The attorney recommended that defendant pay plaintiffs' demand of $705,000. Defendant offered to settle for $225,000 and finally during trial offered $400,000, which was refused. The three-day trial in federal court concluded with the jury's return of verdicts against Intex totalling $1,250,000.

It was only after the return of the verdict in the federal court cases that defendant discovered its error regarding its coverage limits and asked plaintiff to pay all of the judgment over $500,000. In order to protect Intex from levy or attachment plaintiff paid, but under protest. Plaintiff's offer to arbitrate its dispute with defendant was refused and the filing of the case sub judice followed.

The case sub judice was tried before the State Court of Chatham County sitting without a jury. The state court entered its findings of fact (many of which are incorporated in our statement of the facts) and conclusions of law awarding a judgment in favor of plaintiff and against defendant in the amount of $494,871 special damages, $190,525.33 prejudgment interest and $53,081.33 expense of litigation or a total judgment of $738,477.66, plus court costs. In Case No. A89A0687 defendant appeals from the judgment entered against it. Plaintiff's cross-appeal is Case No. A89A0688. *Held*:

1. The trial court concluded that when an insurance company defends its insured pursuant to a policy of liability insurance against a claim which seeks damages in excess of the policy's limits and a judgment is returned in excess of those limits, an insurance company which issued a policy of excess or umbrella coverage to that insured is equitably subrogated to any rights the insured might have against its primary carrier for negligent failure to settle. Thus, the trial court found plaintiff to be subrogated to the rights of its insured, Intex, as to claims which Intex might have against defendant, its primary insurer, arising out of the defense of the tugboat claims. While finding no Georgia cases on point, the trial court adopted the holding of the Ohio Supreme Court in *Centennial Ins. Co. v. Liberty Mut. Ins. Co.*,

404 NE2d 759, 762, "that an excess insurer is subrogated to the insured's rights against a primary insurer and may maintain an action for breach of the primary carrier's good faith duty to settle and defend." See also *Peter v. Travelers Ins. Co.*, 375 FSupp. 1347, 1350; *Continental Cas. Co. v. Reserve Ins. Co.*, 238 NW2d 862; *Valentine v. Aetna Ins. Co.*, 564 F2d 292, and *Vencill v. Continental Cas. Co.*, 433 FSupp. 1371.

Defendant contends the trial court erred in concluding that plaintiff was equitably subrogated to the rights of Intex since such an extension of the doctrine of equitable subrogation (that is in the context of excess and primary insurer) fails to advance the underlying public policies. However, we reach the contrary conclusion since placing the excess insurer in the shoes of the insured advances the public interest in obtaining prompt and just settlement of claims. The existence of excess or umbrella coverage must not relieve the primary insurer of its responsibility to accept reasonable settlement offers lest, in those situations where a claim exceeds the amount of primary coverage, the primary insurer be encouraged to attempt to place its financial burden upon the excess insurer.

2. In addition to plaintiff's claim in its capacity as subrogee of Intex for negligent failure to settle, the pleadings and evidence presented a separate claim based on the Restatement of Torts 2d, § 552 as adopted in *Robert & Co. Assoc. v. Rhodes-Haverty Partnership*, 250 Ga. 680 (300 SE2d 503). See also *Badische Corp. v. Caylor*, 257 Ga. 131 (356 SE2d 198). This alternative theory presents a direct action by plaintiff against defendant based on the false representations by defendant as to its coverage limits.

The trial court concluded that plaintiff, standing in the shoes of Intex, was reasonable in relying upon the defendant's negligently prepared excess letter, both as a matter of fact and as a matter of law. This conclusion by the trial court obviously refers to plaintiff as subrogee of Intex but relates to a claim predicated on the false representations by defendant concerning its coverage limits. Thus, the trial court's judgment is predicated at least in part upon a third theory, that Intex had a right to recover for the misrepresentation as to coverage, which right could be asserted by plaintiff as subrogee of Intex.

Insofar as plaintiff was subrogated to the rights of Intex, plaintiff is put in the place of Intex, entitled to recover all that was available to Intex but also subject to any defenses which could have been asserted against Intex. *Liberty Mut. Ins. Co. v. Alsco Constr.*, 144 Ga. App. 307, 308 (1) (240 SE2d 899). Intex, as the insured under its policy with defendant, was under a duty to read its policy with defendant and is charged with knowledge of the provisions of that policy. *King v. Brasington*, 252 Ga. 109 (312 SE2d 111); *Appling v. Home Fed. Savings &c. Assn.*, 185 Ga. App. 356, 358-359 (1) (364 SE2d 91);

*Ethridge v. Assoc. Mut.*, 160 Ga. App. 687, 689 (288 SE2d 58); *Barnes v. Mangham*, 153 Ga. App. 540 (265 SE2d 867); *Atlanta Intl. Properties v. Ga. Underwriting Assn.*, 149 Ga. App. 701, 702 (2) (256 SE2d 472). Since Intex is charged with knowledge of the terms of its policy with defendant, including its coverage thereunder, it could not reasonably rely on conflicting representations by defendant. It follows that plaintiff, as subrogee of Intex, could not reasonably rely on defendant's letter containing the false representation as to the amount of defendant's coverage of Intex. Thus, the trial court's conclusion in this regard was error and any claim by plaintiff in its capacity as subrogee predicated on defendant's false representation as to coverage is without merit. At the same time, we note that the trial court apparently did not reach any conclusion, nor do we express any opinion regarding the merits of plaintiff's direct action against defendant based only on the false representations.

Nonetheless, it does appear that the judgment against defendant is predicated, at least in part, upon an erroneous theory of law. The trial court's reliance upon an erroneous legal theory requires reversal. *Wood v. Dan P. Holl & Co.*, 169 Ga. App. 839, 840 (2) (315 SE2d 51).

3. While in Division 1 we accepted the reasoning of *Centennial Ins. Co. v. Liberty Mut. Ins. Co.*, 404 NE2d 759, supra, concerning the subrogation issue, we do not thereby alter the standard of care applicable to negligent failure to settle cases in Georgia. Under both *Centennial* and Georgia law recovery is allowed for damages on account of the bad faith tortious refusal of an insurer to settle a liability claim within the policy limits resulting in damage to the insured. A divergence occurs, however, where the refusal of the insurer to settle arises from negligence which does not amount to bad faith. Since the issue of the correct standard of care is easily separated from the subrogation issue, we follow our well settled Georgia law on the standard of care issue. Under Georgia law (but not under Ohio law as stated in *Centennial*) a recovery is permitted for a negligent refusal to settle. While there are Georgia cases which refer to a recovery predicated on a bad faith refusal to settle and make no reference to the availability of a recovery for a negligent refusal to settle, such should not be viewed as inferring that a mere negligent refusal is inadequate to support a recovery. See in this regard *United States Fid. &c. Co. v. Evans*, 116 Ga. App. 93, 94 (2) (156 SE2d 809), and *McCall v. Allstate Ins. Co.*, 251 Ga. 869, 870 (1) (310 SE2d 513), a recent case stating that a recovery may be had where the insurer fails to settle because it is "guilty of negligence or of fraud or bad faith."

Defendant also contends the trial court erred in its factual finding that defendant was negligent in failing to alter its trial strategy after the August 27, 1981, announcement of the federal court which changed the procedure to be used in the trial of the tugboat cases

While there was evidence that the federal court's decision to consolidate the trial of the three claims against Intex created problems for both sides in that case, the inference drawn by the trial court, that the changes in federal court procedure caused a significant increase in the probable verdict against Intex, was authorized by the evidence. While recognizing that the evidence on this issue was conflicting, the resolution of the conflict was for the trial court and we find no error in the trial court's conclusion that defendant was negligent in failing to respond to the change in circumstances. *Evans v. Marbut*, 140 Ga. App. 329, 332 (231 SE2d 94).

4. The trial court erred in finding plaintiff's damages to be liquidated. "A liquidated claim is for an amount certain and fixed. Conversely, a claim is unliquidated when there is a bona fide contention as to the amount owing. *Ryan v. Progressive Retailer Pub. Co.*, 16 Ga. App. 83 (84 SE 834) (1915)." *International Indem. Co. v. Terrell*, 178 Ga. App. 570 (2) (344 SE2d 239). A liquidated claim is "an amount *certain* and *fixed*, either by the act and agreement of the parties or by operation of law; a sum which cannot be changed by the proof; it is so much or nothing; . . ." *Nisbet v. Lawson*, 1 Ga. 275, 287. Where, as in the case sub judice, the amount of damages can only be established by the trier of fact, the damage award is unliquidated. *Marathon Oil Co. v. Hollis*, 167 Ga. App. 48, 51 (3), 52 (305 SE2d 864). Since prejudgment interest is not allowable where the amount recovered is unliquidated and there was no compliance with the Georgia Unliquidated Damages Interest Act, OCGA § 51-12-14 (a), the trial court's award of prejudgment interest was error.

5. The trial court erred in awarding plaintiff expenses of litigation under OCGA § 13-6-11. In order to authorize such an award it is necessary that one of the three statutory conditions exists. The trial court predicated its award on its ruling that defendant was guilty of constructive bad faith and was stubbornly litigious.

The trial court stated its finding that defendant did not act in bad faith at any time. The trial court then proceeded to award expenses of litigation under a theory of constructive bad faith. We find no authority under either Georgia law (or the foreign authority cited by the trial court) for the trial court's theory of constructive bad faith which is apparently somehow derived from constructive fraud. Additionally, as bad faith and constructive bad faith, as conceived by the trial court, are distinctive and the latter is not included among the statutory conditions authorizing an award of expenses of litigation under OCGA § 13-6-11, the award predicated on that theory was error.

Neither was the trial court's conclusion, that defendant was stubbornly litigious in resisting the claim of plaintiff as subrogee of Intex for the misrepresentation of coverage, well founded. Since plaintiff

was not entitled to damages for this claim there can be no award of expenses of litigation for resisting the claim. *Bayliner Marine Corp. v. Prance,* 159 Ga. App. 456, 460 (3), 461 (283 SE2d 676); *Minter v. Powell,* 152 Ga. App. 449, 452 (4) (263 SE2d 235).

6. Finally, in the cross appeal, Case No. A89A0688, the plaintiff raises four enumerations of error, all of which are addressed to the trial court's finding that some payment for the liability of Intex by plaintiff was inevitable and determining that such inevitable contribution was $205,000, which amount was used to reduce the amount of plaintiff's damages. Plaintiff contends it is entitled to recover all of the sum which it paid under its coverage of Intex, and that we should adopt a clear line rule to govern the determination of damages when a primary carrier misinforms an excess carrier as to the coverage it provides the insured. However, the purpose of damages is to place an injured party in the same position as it would have been in had there been no injury or breach of duty, that is, to compensate for the injury actually sustained. Plaintiff's clear line rule while offering simplicity would afford a windfall to the excess insurer and depart from the basic tenet that compensation, not enrichment, is the basis for the award of damages. *Smith v. Overby,* 30 Ga. 241; *Atlantic Coast Line R. Co. v. Ouzts,* 82 Ga. App. 36 (60 SE2d 770). We find no error in the measure of damages utilized by the trial court. These enumerations of error are without merit.

7. In Divisions 1 and 3 we have addressed two of defendant's enumerations of error which are directed (at least in part) to overturning the trial court's conclusions regarding plaintiff's claim, as subrogee of Intex, for damages arising from defendant's negligent failure to settle the federal cases. Thus, as these enumerations are without merit, the trial court's conclusions as to this claim are not affected by this opinion.

In Division 2 we determined that the trial court's judgment was predicated at least in part on an erroneous theory of law and thus requires reversal. Accordingly, the judgment in Case No. A89A0687 is reversed and the case remanded for the entry of a new judgment which should include a redetermination on the issue of plaintiff's entitlement to recover expenses of litigation.

*Judgment reversed and case remanded with direction in Case No. A89A0687. Judgment affirmed in Case No. A89A0688. Carley, C. J., concurs specially. Beasley, J., concurs in the judgments only.*

CARLEY, Chief Judge, concurring specially.

Appellee-plaintiff was proceeding under two theories. The first theory of recovery was that appellee was subrogated to the claim that Intex, its insured, would have for appellant-defendant's negligent failure to settle. This theory is discussed in Division 1 and I concur in

the majority's resolution of that issue.

The second theory of recovery was that appellee had its own direct action against appellant based upon the negligent misrepresentation made to Intex as to the limits of coverage. See *Robert & Co. Assoc. v. Rhodes-Haverty Partnership*, 250 Ga. App. 680 (300 SE2d 503) (1983); *Badische Corp. v. Caylor*, 257 Ga. 131 (356 SE2d 198) (1987). In Division 2, the majority declines to address this theory of recovery, concluding instead that the trial court's judgment is predicated in part upon an alternative "third theory, that Intex had a right to recover for the misrepresentations as to coverage, which right could be asserted by plaintiff as subrogee of Intex." In my opinion, the majority misconstrues the trial court's judgment. When the relevant language of the judgment is read in context, it would appear that no such alternative third theory of recovery was advanced by the trial court. Instead, it appears that the trial court relied upon an erroneous interpretation of the direct action theory that was advanced by appellee. As I read the judgment, the trial court holds that, *under the direct action theory*, it is ultimately immaterial whether appellant was actually aware that appellee would rely upon the representations as to the limits of coverage, since appellant was actually aware that Intex would rely upon those representations and appellee is subrogated to the rights of Intex. This is clearly an erroneous interpretation of the direct action theory. If appellee is to recover under the *direct action* theory, it must necessarily recover in its own right and not in the capacity as Intex's subrogee. In order for appellee to recover in its own right under the direct action theory, it must be shown that appellant was "actually aware [that appellee would] rely upon the information [appellant] prepared." *Badische Corp. v. Caylor*, supra at 133. Obviously, appellant's actual awareness of *appellee's* reliance cannot be shown by evidence of appellant's actual awareness of Intex's reliance.

Accordingly, I concur in the majority's conclusion that the trial court's judgment is predicated in part upon an erroneous legal theory. In my opinion, however, that error relates to the direct action theory and not the so-called alternative third theory of recovery. Therefore, I would not address the merits of the illusory third theory but would simply reverse and remand for the entry of a new judgment which applies the correct legal principles to the issue of appellant's liability under the direct action theory. As to this direct action theory, the trial court " 'has not considered all of the evidence in the light of correct and applicable legal principles[.] [Accordingly,] the case should be remanded to the [trial court] for further findings. [Cit.]' [Cit.]" *Williams v. Morrison Assur. Co.*, 138 Ga. App. 191, 193 (1) (225 SE2d 778) (1976). See also *Ayers v. Yancey Bros. Co.*, 141 Ga. App. 358, 362 (2) (233 SE2d 471) (1977); *Smith v. Helms*, 140 Ga. App. 267, 269 (3)

(231 SE2d 778) (1976).

I concur in the reversal and remand for the entry of further findings as to the appellee's entitlement to recover the expenses of litigation. The issue of appellee's entitlement to recover the expenses of litigation should be redetermined after the trial court readdresses the issue of appellant's liability pursuant to correct legal principles.

DECIDED JULY 28, 1989.

*Bouhan, Williams & Levy, M. Brice Ladson, Joseph A. Mulherin III, Troutman, Sanders, Lockerman & Ashmore, Daniel S. Reinhardt, William N. Withrow, Jr., Stephen W. Riddell,* for appellant.

*Drew, Eckl & Farnham, W. Wray Eckl, Stephen R. Kane,* for appellee.