**GREAT AMERICAN INSURANCE CO., Plaintiff,**

v.

**INTERNATIONAL INSURANCE CO., Defendant.**

**Civ. No. 87–171–ALB/AMER(DF).**

United States District Court,
M.D. Georgia,
Albany/Americus Division.

Dec. 10, 1990.

Robert M. Darroch, Cynthia B. Smith, Darroch & Obenshain, Atlanta, Ga., for plaintiff.

J. Sherrod Taylor, Taylor & Harp, Columbus, Ga., Michael A. Fennessy, William J. Murray, Americus, Ga., J. M. Hudgins, IV, Stephen H. Sparwath, Long, Weinberg, Ansley & Wheeler, Atlanta, Ga., for defendant.

FITZPATRICK, District Judge.

The following case involving plaintiff's alleged negligent or bad faith refusal to settle an automobile accident case between its insured and Tammy Lee Fortner was tried before the court sitting without a jury on October 29, 1990 through November 6, 1990. The court heard final argument in the case on November 9, 1990. Set forth below are its findings of fact and conclusions of law.

## I. FINDINGS OF FACT

On April 4, 1985, Herman T. Heath, while working as a driver for T & R Custom, Incorporated (T & R), was involved in a fatal collision with an employee of the Sumter County Board of Health named Tammy Lee Fortner (Ms. Fortner). Immediately before the collision occurred, Mr. Heath was driving east on a 23 foot wide two lane highway in a 1984 Ford tractor-trailer truck carrying two utility houses measuring 11 feet 10 inches wide and 10 feet 1 inch wide each. Ms. Fortner was in front of Mr. Heath driving east on the same highway in a 1978 Dodge van travel-

ling at a speed of approximately 40–45 miles per hour. Mr. Heath wished to proceed at a rate closer to the posted 55 miles per hour speed limit than 40–45 miles per hour so he decided to pass Ms. Fortner. In the process of driving his truck with its wide load around Ms. Fortner's van, the two vehicles collided in a manner that resulted in the death of Ms. Fortner after she was slung from her vehicle and impaled by a 1″ × 2″ × 16″ wooden stake through her neck.

T & R immediately notified its insurance carrier, plaintiff Great American Insurance Company (Great American), of the accident. The policy in effect between T & R and Great American provided T & R with liability coverage of $250,000.00 per person and $500,000.00 per accident. T & R also had liability insurance coverage pursuant to an excess or umbrella insurance policy with the defendant International Insurance Company (IIC) which provided liability coverage for amounts in excess of $500,000.00 up to $2,000,000.00. Since Great American had primary insurance coverage, it took the lead in undertaking an investigation of the accident.

Great American began its investigation into the cause of the collision by obtaining statements from the only eyewitness, Shelia Jones and the driver of the truck, Mr. Heath. Ms. Jones indicated to the investigator Great American hired that the van driven by Ms. Fortner moved over into the left hand lane and collided with the tractor-trailer truck. Plaintiff's Exh. 14, p. 13. Mr. Heath stated that he was in the process of passing the Fortner van when it suddenly veered over into his lane and struck the left rear tire of his tractor. Plaintiff's Exh. 9, p. 7.

As part of his investigation, the Great American investigator also reviewed the accident report of the investigating officer, Georgia State Patrolman C.H. Holloway, Jr. Patrolman Holloway's accident report was based on information he obtained from Ms. Jones and contained his conclusion that he could not determine the point of impact because of a lack of physical evidence. Plaintiff's Exh. 13. Based on his review of patrolman Holloway's accident report and his interview with Ms. Jones and Mr. Heath, the investigator prepared a report and sent it to Great American. Great American studied the report and determined that liability on the part of its insured appeared extremely doubtful and that its insured stood only about a fifteen percent (15%) chance of losing a lawsuit. Defendant's Exh. 1.

Meanwhile, the parents of Ms. Fortner (the Fortners) hired William J. Murray, Esquire and J. Sherrod Taylor, Esquire to represent them in a wrongful death action against T & R and Mr. Heath. Mr. Murray soon thereafter notified Great American that after interviewing numerous potential witnesses and retaining an accident reconstruction expert, his firm determined that the accident occurred as a result of negligence on the part of Mr. Heath. Defendant's Exh. 5. Mr. Murray also officially requested a settlement award in the amount of $950,000.00 for the injury, pain and suffering, and wrongful death of Ms. Fortner. *Id.*

Having been put on notice that a lawsuit was forthcoming, Great American hired Ray Allison, a lawyer in Columbus, Georgia, to represent T & R and Mr. Heath. Great American also had its Georgia Branch Supervisor, Nancy Hack, prepare another evaluation of the case. Ms. Hack prepared her report on June 11, 1986 and sent it to her supervisor, Don Turner, a senior claims manager at Great American's regional headquarters in Raleigh, North Carolina. In her report, Ms. Hack determined that liability in the case was most doubtful and calculated the insured's chance of exposure to liability at no more than fifteen percent (15%). Defendant's Exh. 6. Mr. Turner reviewed Ms. Hack's report and in agreeing that the case involved minimal, if any, negligence on the part of its insured, he stated in his June 14, 1986, response to Ms. Hack that:

> I'm not interested in settling this case unless it can be done immediately with a payment not to exceed $25,000.00 so again we are in agreement. If we are

put to legal expense then we want the case prepared to be tried to a conclusion. Defendant's Exh. 7.

The anticipated lawsuit of the Fortners against T & R and Mr. Heath (*L.L. Fortner v. T & R Custom, Inc.*, Civil Action No. 2690, hereinafter "the Fortner case") was filed in the Superior Court of Schley County, State of Georgia, in July of 1986. During the ensuing year, however, Great American devoted very little activity of any sort to the Fortner case primarily because Mr. Allison was deeply involved in another case. It was not until the middle of July, 1987 that significant activity concerning the Fortner case resumed. On July 16, 1987, Mr. Allison informed Great American by letter that the case had been set down for trial during the week of August 17, 1987. Mr. Allison also stated in the letter that in his opinion the case would turn on "whether or not the jury believes the independent, lay witness who was behind both vehicles, or believes the plaintiffs' accident reconstruction expert." Defendant's Exh. 27.

In response to Mr. Allison's letter, Great American's new Georgia branch claims manager, Mr. Joe Mangan, prepared a trial report on July 27, 1987, which he sent to his supervisor Jim Iglio. In his trial report, Mr. Mangan rated the Fortners' attorney as a good trial attorney and rated Mr. Allison as an excellent trial attorney. Defendant's Exh. 31. Mr. Mangan also recommended in the report that the case be tried if a compromise could not be worked out in the area of the $30,000.00 reserve that had been established for the case. *Id.*

All that had transpired in the Fortner case prior to the advent of August 1987 indicated that the case involved little, if any, liability on the part of Great American's insured. Things took a decidedly different turn from that point forward however. On August 6, 1987, Mr. Allison, after finally interviewing his witnesses and studying the deposition of the Fortners' expert witness, prepared a trial update report in which he challenged almost every assumption Great American had reached

concerning the case up to that point in time.

The update report begins with the warning that "the case is not as iron clad as it would appear to be on paper." Defendant's Exh. 34. Mr. Allison then gave his assessment of the accident eyewitness whose credibility he had earlier informed Great American was critical to the case. His analysis of Ms. Jones, the eyewitness, was that it was "entirely probable" that she would waiver under an intense cross examination and fail to declare her earlier statements as factually correct. *Id.* Allison concluded that her testimony was going to be somewhat unconvincing. *Id.*

Allison then analyzed the potential value of the investigating officer, C.H. Holloway, Jr. to the case. According to Allison, Holloway's testimony offered very little beyond that of the eye witnesses' because Holloway's accident report, which would control his testimony, was based almost exclusively on the eye witnesses' version of the event. Furthermore, Holloway could not give any expert testimony about what lane the accident occurred in because he had already stated in his report that he was unable to determine the point of impact. *Id.* Allison expressed his opinion that officer Holloway would not be of much assistance to the case.

The next area in which Allison's assessments debunked Great American's theory that this was an open and shut case concerned Great American's belief that it had been clearly established that Ms. Fortner caused the accident when she attempted to make a left hand turn. Allison's interpretation of the Fortners' accident reconstruction expert's testimony and exhibits was that the expert had "some physical facts which can be pointed to as supporting his theory of a side swipe, rather than a left hand turn." *Id.*

Allison also addressed the issue of what type of verdict was now probable in the case. He speculated that a plaintiffs' verdict would be in a range from $200,000.00 to $500,000.00 and possibly higher if the jury is overwhelmed by sympathy. *Id.* Allison intimates in the update report that a

verdict between $500,000.00 and $1,000,-000.00 is not beyond the realm of possibilities in this case, especially if the trial judge allows the jury to view pictures that show a wooden stake impaled through the neck of Ms. Fortner. *Id.* Mr. Allison concludes his assessment of the Fortner case by stating that "[m]y best opinion as to the chances of prevailing at trial would be 50/50 for either plaintiff or defendant." *Id.*

The tenor of Mr. Allison's trial update report unmistakably warns Great American that almost all its previous assessments of the case were wrong and must be changed. In light of that warning, Great American did not modify, alter, or adjust its previous determination of liability in the case. Nor did Great American make any serious attempt to negotiate with the Fortners' attorney over their demand which had recently been reduced from $950,000.00 to $325,-000.00.

As the trial date approached, other aspects of Great American's open and shut case became suspect. On August 10, 1987, Mr. Allison indicated in a letter to Mr. Mangan that there were problems concerning the testimony of the investigating officer and attempts by the Fortners' attorney to gain an advantage from the fact that the insured's driver did not have a class V (large trucks) driver's license. Defendant's Exh. 37.

Pressure to settle the case also increased as the trial date drew near. On Friday, August 14, 1987, the Fortners' attorneys decreased their demand again to $250,-000.00, which was a sum of money that was within Great American's policy limits. Defendant's Exh. 46. T & R's personal attorney James Skipper, Jr., also told Mr. Allison on August 14, 1987, that his client, Great American's insured, was officially demanding that Great American accept the Fortner's $250,000.00 settlement offer.

On that same day, Mr. Allison telephoned Mr. Mangan to inform him of the settlement demands and additional changes in his assessment of the case. Mr. Allison told Mr. Mangan that in his opinion the Fortners were now using an expert witness who did a much better job of arguing their theory of the case which now made it probable that the Fortners would get a favorable verdict in excess of the $250,000.00 policy limit. *See* Defendant's Exh. 47. Mr. Allison confirmed his telephone comments to Mr. Mangan in a final trial status report he prepared that day at the conclusion of his conversation with Mr. Mangan. Mr. Allison specifically stated in the report which Mr. Mangan received on August 15, 1987 that:

> The Testimony of Mr. Dooman [the Fortners' new accident reconstruction expert] tips the scale in favor of a plaintiffs' verdict. If there is a plaintiffs' verdict, I think it will be in excess of your policy limits of 250,000.00. The seriousness of this case and the potential amount of the verdict that could be awarded is not something to be taken lightly. The risk to your insured in exposing them to the perils of a jury trial in this case are real and substantial. With the risk attendant in every jury trial, and especially in a death case with a sharp dispute on liability, the likelihood of a plaintiffs' verdict is more probable than not.

Defendant's Exh. 47.

Additional sources indicated to Great American that it needed to seriously reassess its position and the manner in which it was handling the Fortner case. In a letter dated August 14, 1987, IIC's representative, Mr. Jim LeVert, told Great American that "your evaluation [of the case], as supported by your offer, is not realistic in our view ... [therefore] International Insurance Company strongly urges you to settle the case up to the $250,000.00 demand." Defendant's exhibit 44.

Great American did not, however, heed any of the advice it received from anyone other than its employees. After receiving Mr. Allison's August 14, 1987 final trial status report indicating that the odds for success were now clearly against them and other data which conclusively established that the Fortners' attorneys had steadily amassed a stronger and stronger case, Great American still did not modify, alter, or adjust its initial determination of liability

in the case. Furthermore, although Great American did increase its settlement offer from $25,000.00 to $40,000.00, it continued its refusal to undertake any serious attempt to negotiate with the Fortners' attorneys over their settlement demand which had recently been reduced from $325,000.00 to $250,000.00.

Having refused to accept the Fortners' settlement offer or respond with a realistic counter offer, the trial of the Fortner case began as scheduled on Wednesday, August 17, 1987. Great American had Nancy Hack present as its observer to report on the trial. IIC hired William Cheves, Esquire to observe and report developments in the case to it.

The trial itself proceeded along the course that those not employed by Great American had predicted. The eyewitness Ms. Jones, who contradicted her earlier account of the accident by refusing to state that Ms. Fortner's van had crossed the centerline before it struck the truck, proved to be an ineffective witness. On the other hand, the Fortners' accident reconstruction expert presented a credible explanation of how all the physical evidence forced one to conclude that the accident occurred as a result of the oversized utility house on the back of Mr. Heath's truck sideswiping Ms. Fortner's van while it was in its proper lane. Other indications that the trial was proceeding in a manner favorable to the Fortners include the fact that the testimony of Ms. Fortner's family and friends appeared to have caused an impassioned response in the jury.

At the close of evidence in the case on August 20, 1987, before final argument, Great American was apprised of the events that had transpired at the trial. Mr. Allison telephoned Don Turner, a Great American senior claims manager with settlement authority, to give him his assessment of the case and attempt to persuade him to settle the case even if it meant offering $250,000.00. Defendant's Exh. 57-A. Mr. Allison implored Mr. Turner to authorize a settlement in order to "cap uncertainty with certainty." *Id. Mr. Turner rebuffed Mr. Allison's request and told him that his job was to give opinions and Mr. Turner's job was to make decisions so go back and finish the trial because Great American had decided to try the case.* Despite Mr. Allison's emphatic settlement plea, which was supported by clearly documented events that warranted settlement on the Fortners terms, Great American, nonetheless, intransigently refused to modify, alter, or adjust its previous determination of liability in the case. Great American did increase the amount of its offer at trial from $40,000.00 to $50,000.00 but once again that increase did not represent a serious attempt on Great American's part to negotiate a settlement of the case.

The Fortner case had one final step before reaching its conclusion. So too would Great American be exposed to one final series of events that would foreshadow the need to change its initial evaluation of the case and enter into legitimate settlement negotiations. The last event in the case before sending it to the jury was closing argument which took place on August 21, 1987. During closing argument the jury gave a signal that it might be leaning in favor of the Fortners when at least one juror wrote down the damages figure that the Fortners' attorney had asked them to award. A more ominous indication for Great American that a large verdict might be rendered against its insured was the fact that the jury was shown the gory photograph of Ms. Fortner impaled by a wooden stake through her neck for the first time and reacted to it in a very emotional way.

Senior management of Great American was apprised of what had taken place during closing argument and still had the opportunity and the ability to settle the case within the policy limits before a verdict was rendered. At this final opportunity to decide whether or not to settle the case, Great American had information before it which indicated that the entire trial had transpired contrary to the original assessment it made of how the case would proceed. Additionally, Great American was strongly urged by its insured's attorney, IIC's claims personnel, and the attorney it retained to try the case, (basically everyone

involved in the case other than Great American employees), to settle the case in order to avoid a potentially disastrous verdict. Nevertheless, Great American did not modify, alter, or adjust its previous determination of liability in the case or conduct any type of comprehensive re-evaluation of the case. Nor did Great American make any serious attempt to negotiate a settlement of the case. Shortly thereafter, the jury returned a verdict in favor of the Fortners in the amount of $4,100,-000.00.

The trial court deemed the jury's damages award excessive and reduced it to $400,000.00 pursuant to O.C.G.A. § 51–12–12 (Supp.1990). The Fortners, who had the option of accepting the $400,-000.00 or retrying the case on the issue of damages only, decided to forego the $400,-000.00 and hold a damages only trial. Before the trial could be held, however, the parties agreed to settle the case for $1,000,-000.00 of which IIC paid $500,000.00 on February 26, 1988.

## II. CONCLUSIONS OF LAW

As a threshold matter the court must address the issue of whether or not IIC, acting as an excess carrier, has standing to assert its counterclaim against the primary insurer Great American in this declaratory judgment action brought by Great American. While Great American argues in its motion for a directed verdict that IIC has no standing, Georgia law, which applies in this diversity action, indicates otherwise.

██ As noted by the court in its order addressing Great American's motion for summary judgment, Georgia courts have upheld the right of an excess insurer to bring suit against a primary insurer based on a negligent or bad faith refusal to settle. *See Home Insurance Co. v. North River Insurance Co.*, 192 Ga.App. 551, 385 S.E.2d 736 (1989).

In *Home Insurance Co.*, the Georgia Court of Appeals affirmed an excess insurer's right to bring suit against a primary insurer based on the doctrine of equitable subrogation because to do so "advances the public interest in obtaining prompt and just settlement of claims." *Home Insurance Co.*, 192 Ga.App. at 555, 385 S.E.2d at 740. The court noted in justification of its decision that,

> [t]he existence of excess or umbrella coverage must not relieve the primary insurer of its responsibility to accept reasonable settlement offers lest, in those situations where a claim exceeds the amount of primary coverage, the primary insurer be encouraged to attempt to place its financial burden upon the excess insurer.

*Id.* The *Home Insurance Co.* holding and the underlying public policy considerations which form the foundation of the decision clearly establish IIC's right to bring its claim against Great American in a case such as this.

██ IIC's claim alleges that Great American engaged in the negligent or bad faith refusal to settle the Fortner case proximately causing IIC to make a $500,-000.00 payment to the Fortners that it otherwise would not have been required to pay. In order to demonstrate negligent refusal to settle, IIC must prove by a preponderance of the evidence that Great American failed to use that degree of care which is exercised by an ordinary prudent insurer under the same or similar circumstances. *U.S. Fidelity & Guaranty Co. v. Evans*, 116 Ga.App. 93, 156 S.E.2d 809, 811, *aff'd* 223 Ga. 789, 158 S.E.2d 243 (1967); O.C.G.A. § 51–1–2 (1982). In deciding whether or not to settle the case, Great American had a duty to "accord the interest of its insured and any excess or umbrella insurance company the same faithful consideration it gives its own interest." *Davis v. Cincinnati Insurance Company*, 160 Ga.App. 813, 288 S.E.2d 233, 237–38 (1982); *See also, Home Insurance Co. v. North River Insurance Co.*, 192 Ga.App. 551, 385 S.E.2d 736 (1989). Additionally, IIC could prove bad faith refusal to settle on the part of Great American by demonstrating that Great American's decision not to settle the case was arbitrary and capricious. *U.S. Fidelity & Guaranty Co.*, 116 Ga.App. 93, 156 S.E.2d 809; *Gingold v. Government Emp. Ins. Co.*, 159 Ga.App. 410, 283 S.E.2d 614, 615 (1981), *rev'd* on

**364**

other grounds, 249 Ga. 156, 288 S.E.2d 557, *vacated* on other grounds, 162 Ga.App. 207, 290 S.E.2d 557 (1982).

■ Application of the pertinent law to the facts of this case indicates that IIC has carried its burden of showing by a preponderance of the evidence that Great American is guilty of both negligent and bad faith refusal to settle the Fortner case. It is clear from the court's findings of fact that Great American failed to give equal consideration to the interests of IIC. In the face of overwhelming evidence indicating that its original assessments of the case were incorrect and that there existed a strong possibility that a verdict substantially beyond its policy limits would be rendered against its insured, Great American, in absolute disregard of the opinion of the attorney it hired and rated as an excellent trial attorney, *never* modified, altered, or adjusted it initial determination of liability and *never* undertook serious settlement negotiations. There can be no doubt that an ordinary prudent insurer under similar circumstances would not have acted in the same manner.

The refusal of Great American to conduct a comprehensive re-evaluation of the case or engage in legitimate settlement negotiations was in fact so egregious that it goes beyond a negligent failure to settle and represents an arbitrary and capricious decision not to settle the case. This court's findings of fact demonstrate that Great American decided at the initial stages of this case that it would either settle it immediately or try it to its conclusion. Mr. Turner stating as much in his June 14, 1986 response to Ms. Hack and Great American's actions indicate that it adopted just such an attitude. One particularly telling incident was Mr. Turner's complete disregard for the pleas of Mr. Allison at the close of evidence in the case that Great American consider settling the case. Mr. Turner, in essence, told Mr. Allison that his opinion was irrelevant because the decision had already been made to fully litigate the case to a final resolution. The inference drawn from Mr. Turner's comments, along with the remainder of evidence presented in the case, leads the court to conclude that Great American exhibited bad faith in its handling of the case and its refusal to settle.

■ IIC has asked that upon a finding of bad faith, the court award it litigation expenses pursuant to O.C.G.A. § 13–6–11. Before such an award can be made under O.C.G.A. § 13–6–11, however, the requesting party must provide the court with evidence which demonstrates the expenses submitted were reasonably incurred. *Eways v. Georgia R.R. Bank,* 806 F.2d 991 (11th Cir.1986). Furthermore, "hours attorneys spend on a case must be documented in order to sustain an award of attorneys' fees authorized by statute." *Sweeney v. Athens Regional Medical Center,* 917 F.2d 1560, 1571 (11th Cir.1990).

■ The current data IIC has furnished the court in support of its request for litigation expenses, a one page summary listing its estimated total expense of litigation, is not sufficient evidence upon which the court can determine whether or not IIC is entitled to litigation expenses. Therefore, the court will defer its ruling on litigation expenses until a later date.

■ An additional claim made by IIC is that it is entitled to receive pre-judgment interest on its damages award. "Under Georgia law, if a sum is liquidated, pre-judgment interest accrues from the date of demand at a rate of 7 percent per annum." *General Elec. Credit Corp. v. Strickle Properties,* 861 F.2d 1532 (11th Cir.1988); O.C.G.A. §§ 7–4–15 and 7–4–2 (1989). A liquidated sum is "an amount *certain* and *fixed,* either by the act and agreement of the parties or by operation of law; a sum which cannot be changed by the proof; it is so much or nothing; ..." *Home Insurance Co.,* 192 Ga.App. at 556, 385 S.E.2d at 741 (citing *Nisbet v. Lawson,* 1 Ga. 275, 287 (1846)). "Where ... the amount of damages can only be established by the trier of fact, the damage award is unliquidated." *Id.*

■ There has never been a dispute in this case over the sum IIC was required to pay as a result of the fact that the Fortner

case was not settled before a verdict was rendered. The dispute involves only a question of whether or not Great American was guilty of negligent or bad faith refusal to settle the case when it failed to do so by meeting the Fortners' demand for $250,000.00. If it was determined that Great American properly refused to meet the Fortners' $250,000.00 settlement demand, then IIC receives nothing; if Great American improperly refused to meet the settlement demand, both parties agree the damage proximately caused was the $500,000.00 IIC had to contribute to the Fortners' settlement fund.

There is no scenario under which proper action by Great American, (settlement within its policy limits), would have resulted in the need for IIC, as the excess insurer, to expend any of its funds; nor are there any factors present in this action that would change IIC's damages figure of $500,000.00 if the liability ruling went against Great American. The $500,000.00 IIC claims it is owed is an amount certain and fixed by the acts and agreement of the parties that IIC pay $500,000.00 into a fund designed to bring a certain end to the Fortner case. It is a sum which cannot be changed by the proof; and it is so much or nothing, not reliant on determination by the trier of fact. Therefore, IIC is entitled to an award of pre-judgment interest which shall be calculated from the date it paid $500,000.00 into the Fortners' settlement fund.

██ The last matter the court must address is IIC's claim against Great American for punitive damages. Under Georgia law, the court may award IIC punitive damages if the actions of Great American amount to willful misconduct, malice, fraud, wantonness, oppression, or an entire want of care that would raise the presumption of conscious indifference to the consequences of its actions. O.C.G.A. § 51–12–5.1 (Supp. 1990). The actions of Great American, while egregious in certain aspects, do not rise to the level necessary for an award of punitive damages in this case. Therefore, IIC's request for punitive damages is DENIED.

## III. CONCLUSION

In the opinion of this judge, based on 20 years of general law practice and 5 years on the bench, that this case was without doubt one that a reasonable defendant would have settled, even up to the policy limits if necessary. It matters little if in the beginning the defendant was advised by an independent claims adjuster that there was little to worry about if slowly, but surely, the situation changed from a sure victory for the defendant to a certain victory for the plaintiff, and in a large amount. There were, however, alarm bells all along that would have advised a reasonable person that things were not as they had once seemed. Throughout every stage of litigation, from the initial investigation to the eleventh hour right before verdict, each representative of Great American Insurance Company saw the facts as he or she wished them to be and not as they were. The stain in the plaintiff's lane of travel shown in the photograph, the waffling nature of the eye witnesses' testimony, the lack of a proper driver's license by the defendant's driver, the plausible scenario of the collision outlined by the expert witness Dooman, the lack of a credible foundation for the State Patrolman's opinions regarding fault, the impeccable character and potential for success of the deceased, the gruesome photo of the wooden stake through the decedent's neck, and last, but by no means least, the advice of one of the top defense lawyers in southwest Georgia that the case would almost certainly be lost and for an amount beyond the policy limits, would have put a reasonable person on notice that any further litigation would be so ill advised as to be reckless. Ray Allison was hired by Great American to represent it in the underlying suit. As is often the case, things looked pretty good for the defendant at the beginning and Mr. Allison so advised, but, as is also often the case, the situation changed and counsel became less sure of the merits of Great American's position and so advised. Then things changed again and counsel became concerned that the plaintiff would get a verdict and he so advised his

client. Things changed once more and it became apparent to counsel that not only would plaintiff more than likely get a big verdict it would even be beyond the coverage afforded under the Great American policy. William Prosser, the great professor of tort law and whose hornbook is a standard in every law school library in the country has said:

> A lawyer in practice spends a considerable part of his life doing distasteful things, against an impossible time limit and with constant interruptions from those who want to derail the train; and for his blood, sweat, and tears he receives in the end a few unkind words to the effect that it might have been done better, and a protest at the size of the fee.

This was a case where the lawyer's training and experience led to the inescapable conclusion that the case could not be won and should be settled. Mr. Allison was hired by Great American for his time and advice. It is now obvious that had it taken his advice there would have been no need for this order to have ever been written.

Based on the above findings of fact [1] and conclusions of law, the court hereby rules against Great American and in favor of IIC in regard to its counterclaim that Great American negligently and in bad faith refused to settle the Fortner case. Accordingly, the court awards IIC the sum of $500,000.00 in compensatory damages. Furthermore, IIC shall receive pre-judgment interest on its damages award of $500,000.00 as computed by the clerk of court in accordance with this order. IIC's claim for litigation expenses will be determined at a later date and its punitive damages claim is DENIED.

SO ORDERED.

---

**1.** In determining the facts of this case, the court found no need to rely on the deposition of William Cheves and therefore considers Great American's Motion to Suppress the Deposition of William Cheves a moot issue.