## S12Q0941. MCI COMMUNICATIONS SERVICES, INC.
## v. CMES, INC.
### (728 SE2d 649)

CARLEY, Chief Justice.

On March 30, 2007, CMES, Inc. was performing excavation work in Stone Mountain, Georgia, when, at around 9:41 a.m., it accidentally severed an underground fiber-optic cable owned by MCI Communications Services, Inc., d/b/a Verizon Wireless. The severance rendered the cable incapable of transmitting telecommunications traffic. According to MCI, the severance caused 568,000 switched calls to be blocked and provoked 242 complaints from customers whose service was interrupted. Further communications disruption would have resulted except that MCI had spare restorative capacity that it had previously installed for $6.4 million. MCI Field Operations identified the location of the severance by 10:00 a.m., the first optical system was restored by 1:16 p.m., 95% of the transmission systems on the severed cable were back up by 3:45 p.m., and all traffic impacting systems on the cable were restored by 5:42 p.m. Thus, the severed cable was back to full capacity usage in about eight hours.

Due to MCI's spare restorative capacity, it did not need to rent substitute capacity from any other carrier during the cable's downtime, and, in fact, there is no such market for renting optical carriers on an hourly basis. Although the severance impacted service, causing blocked calls and customer complaints, MCI has produced no evidence that it issued any customer refunds or credits, lost any customers, or lost any profits due to the severance. However, MCI sued CMES in the United States District Court for the Northern District of Georgia on theories of negligence and trespass, and sought damages consisting of the costs to repair the severed cable in the amount of $27,926.86, compensation in the amount of $362,468.10 for the loss of use of the cable during the time it took to repair it, and punitive damages. MCI based its amount of loss of use damages on the theoretical rental value of the full capacity of the severed fiber-optic cable for the approximately eight hours that it was being repaired. CMES moved for partial summary judgment on, among other things, the claim for the loss of use damages, contending that MCI cannot show any monetary loss because its service was only momentarily interrupted due to the spare restorative capacity and that estimating loss of use damages on a theoretical rental value would be improper. MCI responded that it should not be punished for having the foresight to install a backup system at considerable cost. The district court granted partial summary judgment in favor of CMES, holding that MCI could not recover loss of use damages. On appeal, the United

States Court of Appeals for the Eleventh Circuit certified the following question to this Court:

> Under Georgia law, may a telecommunications service provider whose cable is severed recover loss-of-use damages measured by the rental value of substitute cable when it has not rented such cable or otherwise incurred any monetary loss apart from the cost of repair?

*MCI Communications Services v. CMES*, 669 F3d 1313, 1314 (11th Cir. 2012).

Loss of use damages are a type of compensatory damage, and the award thereof has long been approved by Georgia courts. See *F.H. Ross & Co. v. White*, 224 Ga. 324, 325 (1) (161 SE2d 857) (1968); *Doughty v. Simpson*, 190 Ga. App. 718, 721 (3) (380 SE2d 57) (1989). Therefore, an examination of Georgia law regarding the purpose of loss of use and other compensatory damages will inform our analysis of whether MCI is entitled to loss of use damages under the circumstances presented here.

"Damages are given as compensation for injury. . . ." OCGA § 51-12-4. Under Georgia law, an injury to a person or damage to property is required before tortious conduct is actionable. *Synalloy Corp. v. Newton*, 254 Ga. 174, 177 (2) (326 SE2d 470) (1985). Moreover, excluding the situations where the law presumes injury, a negligent act does not result in tortious conduct unless and until an injury to a person or damage to property has been caused. See *Tante v. Herring*, 264 Ga. 694-695 (1) (453 SE2d 686) (1994); *Parris v. Atlanta, Knoxville & Northern R. Co.*, 128 Ga. 434, 437-438 (1) (57 SE 692) (1907); *Conner v. Hart*, 252 Ga. App. 92, 94 (1) (a) (555 SE2d 783) (2001); *Pinholster v. McGinnis*, 155 Ga. App. 589 (1) (271 SE2d 722) (1980). "[S]ome injury [or damage] — even if small or nominal — is necessary. [Cit.]" *Conner v. Hart*, supra. For example, in *Hortman v. Cantrell*, 173 Ga. App. 429 (326 SE2d 779) (1985), the Court of Appeals, applying the fair market value rule of computing damages, held that plaintiffs could not recover damages against a contractor who built their house contrary to their specifications because the actual completed home was worth substantially more than the promised home.

"[T]he purpose of damages is to place an injured party in the same position as it would have been in had there been no injury or breach of duty, that is, to compensate for the injury actually sustained." *Home Ins. Co. v. North River Ins. Co.*, 192 Ga. App. 551, 558 (6) (385 SE2d 736) (1989). See also *John Thurmond & Assoc. v. Kennedy*, 284 Ga. 469 (1) (668 SE2d 666) (2008). In a negligence

action, "an out-of-pocket measure of damages is commensurate with the culpability of the tortfeasor, who acted negligently, rather than intentionally or maliciously. [Cit.]" *BDO Seidman v. Mindis Acquisition Corp.*, 276 Ga. 311, 312 (1) (578 SE2d 400) (2003). " 'The rationale of damages, as in this case, is to compensate the plaintiff and not to unreasonably burden the defendant beyond the point of compensating the plaintiff.' " *Atlanta Recycled Fiber Co. v. Tri-Cities Steel Co.*, 152 Ga. App. 259, 265 (3) (262 SE2d 554) (1979). The basic tenet under Georgia law is "that compensation, not enrichment, is the basis for the award of damages. [Cits.]" *Home Ins. Co. v. North River Ins. Co.*, supra. Generally, compensatory damages are given "where an injury is of a character capable of being estimated in money." OCGA § 51-12-4.

> "Where a party sues for damages, he has the burden of proof of showing the amount of loss in a manner in which the jury or the trial judge in nonjury cases can calculate the amount of the loss with a reasonable degree of certainty."

*Lester v. S.J. Alexander, Inc.*, 127 Ga. App. 470, 471 (1) (193 SE2d 860) (1972). See also *Universal Credit Co. v. Starrett*, 61 Ga. App. 132, 135 (2) (6 SE2d 80) (1939). The loss of use of damaged but repairable personal property measured by the reasonable rental rate has its roots in cases involving injury to domestic animals such as horses or mules and in automobile cases. See *Atlanta & West Point R. Co. v. Hudson*, 62 Ga. 679 (2) (1879); *Georgia R. & Elec. Co. v. Wallace & Co.*, 122 Ga. 547 (50 SE 478) (1905). However,

> the maximum recovery for a repairable [property] including loss of use may not exceed value before the injury. [Cits.] This ceiling removes temptation for a party to seek to make a profit out of the unfortunate occurrence and at the same time makes him financially whole.

*Firestone Tire & Rubber Co. v. Jackson Transp. Co.*, 126 Ga. App. 471, 478 (2) (191 SE2d 110) (1972). Moreover, loss of use damages are only recoverable if the personal property was impaired but not destroyed. If the property is destroyed, then the damages would be the full market value of the property at the time of the impairment or loss, and thus "further recovery would be barred as exceeding the maximum that is otherwise allowable." (Emphasis omitted.) *Boral Bricks v. Old South Transp. Mgmt.*, 198 Ga. App. 678, 679 (1) (402 SE2d 777) (1991). In fact, the principle that a plaintiff cannot recover an amount

of damages against a tortfeasor greater than the fair market value of the property prior to the impairment is of such great import that a plaintiff seeking damages only for the amount of repairs on the property must still provide evidence of the fair market value of the property before the impairment in order to prevail. See *Canal Ins. Co. v. Tullis*, 237 Ga. App. 515, 516 (1) (515 SE2d 649) (1999); *Goss v. Total Chipping*, 220 Ga. App. 643, 647 (5) (a) (469 SE2d 855) (1996), abrogated on other grounds, *Webster v. Boyett*, 269 Ga. 191, 196 (2) (496 SE2d 459) (1998).

Applying the legal principles cited above, it is clear that MCI cannot recover loss of use damages absent some showing of monetary loss apart from the cost of repair. An injury to a person or damage to property is required for a tort to be actionable, and MCI did not expend any money to keep its system running, nor did it suffer any lost profits, and thus it has failed to show damage qualifying as loss of use that would require compensation. Moreover, another underlying principle of compensatory damages law is not triggered here, that is, that the purpose of damages is to put the aggrieved party in the position, as near as possible, as he or she would have been without the injury or damage. In the present case, MCI cannot argue that it would not have invested in the spare restorative capacity if the severance had not occurred. The spare restorative capacity was built prior to the severance, and its purpose was to ensure the ability to reroute telecommunications traffic in the event of any outage or when such a reroute is needed in the ordinary course of business. To require CMES to reimburse the costs of a system that MCI uses for several purposes and for all kinds of outages, including those caused by MCI or other third parties, would be inequitable and would result in placing MCI in a position significantly better than it would have been without the severance. Furthermore, due to the frequency of outages, MCI admits that it needs the redundant system to remain competitive in the telecommunications industry. Thus, the redundancy system has an inherent value to MCI apart from its value in emergencies, and MCI has not shown that the costs of such infrastructure have not been in some way charged back to its customers by way of, for example, higher rates.

MCI also has not met its burden of proving its losses in such a way that a jury or trial judge can calculate the loss of damages with a reasonable degree of certainty. *Lester v. S.J. Alexander*, supra. MCI claims that its loss of use damages in the amount of $362,468.10 are based on the theoretical rental value of the full capacity of the severed fiber-optic cable for roughly eight hours. However, MCI admits that there is no market for the rental of fiber-optic capacity by the hour. Therefore, there is no reliable method for ascertaining and verifying

the rates that MCI suggests are reasonable, and, under Georgia law, " '[a]n allowance for damages cannot be based on guesswork. [Cit.]' [Cit.]" *Lester v. S.J. Alexander*, supra. Additionally, MCI has not met its burden of proving that the amount of damages 'it seeks is not greater than the fair market value of the cable before it was severed. In fact, evidence in the record shows that the amount that MCI seeks in loss of use damages is roughly seven times the estimated value of a one-mile length of fiber-optic cable, 13 times the total cost of repairs, and 152 times the cost of materials used in the repair. As MCI's claimed loss of use damages are not based on amounts MCI actually lost, requiring CMES to pay these "damages" would only result in an unfair windfall to MCI.

We are also unconvinced that MCI actually suffered a loss of use of its telecommunications system due to the severance of the cable. MCI contends that it lost the use of the specific cable that was severed, but this cable has no value to MCI apart from its utility to the entire telecommunications system. The cable must be integrated into MCI's system in order to fulfill its intended purpose. Moreover, MCI calculated its assessment of the reasonable rental value of the severed cable not by measuring the rental value of a single fiber-optic cable, but rather by calculating the rental value of the intangible telecommunications service that was carried on that cable but was successfully rerouted after the severance. Thus, MCI seeks recovery for the ability to provide telecommunications services even though MCI never lost this ability "because the service was rerouted to another part of the system." *MCI WorldCom Network Services v. Mastec*, 995 S2d 221, 224 (Fla. 2008).

MCI analogizes the redundancy in its telecommunications system to a twin-engine airplane. Although the two are similar in some respects, it is a difference between the two that illustrates why MCI cannot seek loss of use damages measured by a theoretical rental rate. Like MCI's redundant system, the twin-engine airplane allows the plane to continue to fly even if one of the engines becomes damaged and stops working in mid-air. MCI's system utilizes many fiber-optic cables that keep the system running in the event one of the cables is severed. There is no question that the owner of the twin-engine airplane would be able to seek loss of use damages measured by the rental rate of a substitute aircraft while the failed engine is being repaired, placing the original airplane out of commission. Moreover, if the owner could show that the working engine suffered in some physical way due to its sole powering of the airplane after the failure of the second engine, then such damages would be recoverable. However, it is illogical to say that the owner of the airplane would be able to seek loss of use damages measured by the rental

value of a substitute aircraft for the time that the damaged airplane continued to fly with one engine. No owner could or would actually hire a substitute of the aircraft at that point, as no substitute is needed to keep the plane working. In the present case, MCI seeks loss of use damages measured by the rental value of a substitute cable for a period of time that equates to the airplane running on one engine, as there was never a time when MCI's telecommunications system was out of use. The significant difference between MCI's system and the twin-engine airplane is that, due to the inherent character of a telecommunications system, a severed fiber-optic cable may be repaired while the unit is still working but a failed airplane engine requires the entire unit to be placed out of commission to be repaired. If the entire unit is placed out of commission, then loss of use damages measured by the rental rate of substitute property would be recoverable in order to compensate the owner for the time the unit was out of use. However, when the entire unit, due to its structure, continues to work while repairs are being made, there is no need, theoretically or actually, for the owner to rent substitute property, and thus compensation for such rental is inapposite. There is

> a distinction between the rental value as a measure of loss-of-use and the use of rental value as indicative of loss of use. Using rental value as an indication of loss of use is akin to placing the cart before the horse. This Court must first determine that a loss of use has occurred.

*MCI WorldCom Network Services v. W.M. Brode Co.*, 413 FSupp.2d 868, 872 (N.D. Ohio 2005). The dissent states that, contrary to our analysis, MCI's rerouting of traffic after the severance of its fiber-optic cable is more akin to a five-seat plane that is not used in the company's normal course of business substituting for a damaged ten-seat plane that causes the owner to "lose half of its revenue." However, the dissent overlooks that MCI did not lose any revenue in the present case, that its telecommunications system was never out of commission, and that it does not have spare cables that are reserved only for emergencies. Thus, the more relevant comparison is a ten-seat plane that continued to fly on one engine while the second engine was repaired and thus never had to be placed out of service. Even if we follow the dissent's hypothetical to the point of substituting a five-seat plane for the ten-seat plane, the more appropriate analogy would be that, even though the airplane company could only accommodate five people in its plane, it was still receiving revenue as if ten people were on the plane. Likewise, even if MCI's telecommunications system suffered diminished capacity from the severance of

the cable, it still earned exactly the same amount of revenue it would have if the cable had never been severed. Thus, neither the airplane company in the hypothetical nor MCI suffered damages that would be compensable in the form of the rental value of a substitute aircraft. In short, the concept of loss of use has little relevancy to a temporarily damaged telecommunications cable which impaired neither service nor revenue, as is the case here.

In light of the fact that MCI is not entitled to compensation for damages it did not actually suffer, the motorized vehicle loss of use cases relied upon by MCI to support its claim of entitlement to such damages are easily distinguished. In *Appling Motors v. Todd*, 143 Ga. App. 644 (239 SE2d 537) (1977), the damaged property was a corn combine that was under repair during the peak of harvesting season. In *Apostle v. Prince*, 158 Ga. App. 56 (279 SE2d 304) (1981), the damaged property was a personal automobile that could not be used while under repair. In *Southern Crate & Veneer Co. v. McDowell*, 163 Ga. App. 153 (293 SE2d 541) (1982), a pulpwood truck was damaged and thus was unable to be used in the plaintiff's commercial hauling business while under repair. These vehicles, however, are not comparable to a fiber-optic cable that, although rendered temporarily useless itself, is part of an integrated network that at all times remained in use, even during the time of repair of the cable. The plaintiffs in the cases cited above lost the use of their entire property, which required them to replace, substitute, or hire other property in order to carry out the needed functions. In contrast, MCI did not lose the use of its system and, due to the design thereof, did not have to rent a replacement cable to keep its system functioning.

> MCI, in the creation and implementation of its fiber optic system developed the capability to instantaneously reroute interrupted telecommunications traffic from damaged lines to redundant lines without loss of service. This ingenious system was presumably implemented to provide better service to customers, which in turn makes it more attractive to customers and investors. This is not comparable to the loss of use of an automobile. The owner of a damaged automobile must necessarily find an alternate means of similar transportation. . . . As there is a clear distinction between the transportation of telecommunications traffic and the transportation of automobile traffic, so must there be a distinction drawn between the loss of use of a vehicle and the loss of the use of an integrated, redundant telecommunications cable.

*MCI WorldCom Network Services v. W.M. Brode Co.,* supra at 872-873.

MCI relies on *Appling Motors, Apostle,* and *Southern Crate* for the proposition that a plaintiff need not have actually rented substitute property to be awarded loss of use damages based on the reasonable rental rate. Although accurate, that proposition is inapplicable to the present case. Loss of use damages based on the reasonable rental rate of substitute property was awarded in *Appling Motors, Apostle,* and *Southern Crate* because substitute property was actually needed in order for a continuation in services after the original property was damaged. MCI, however, did not need to rent substitute property in order to continue its telecommunications services. Additionally, unlike the evidence offered in *Appling Motors, Apostle,* and *Southern Crate,* the theoretical rental value presented by MCI is entirely speculative because it is based on a market that does not exist. Although MCI points out that there was evidence in *Southern Crate* that one could not rent a pulpwood truck because it had to be custom-made, there was also evidence of the rental value of like or similar equipment, and the trial court charged the jury that it could calculate the loss of use damages by looking at other evidence if there was insufficient evidence of rental value. Here, MCI has not provided evidence of the rental value of property similar to fiber-optic cables and has not argued for the calculation of loss of use damages on evidence other than rental value. Therefore, *Southern Crate* does not control our analysis in this case.

Finally, the majority of courts that have addressed this issue in identical lawsuits brought by MCI against contractors for similar damage to an MCI fiber-optic cable has held that loss of use damages measured by a theoretical rental rate are inappropriate in such a factual situation. See *MCI WorldCom Network Services v. Mastec,* supra; *MCI v. Patriot Engineering & Environmental,* 487 FSupp.2d 1029, 1039 (II) (S.D. Ind. 2007); *MCI WorldCom Network Services v. W.M. Brode Co.,* supra; *MCI WorldCom Network Services v. Lind,* 2003 WL 24304128, *2 (1) (S.D. Fla. 2003); *MCI WorldCom Network Services v. Glendale Excavation Corp.,* 224 FSupp.2d 875, 880 (III) (C) (D.N.J. 2002). But see *MCI WorldCom Network Services v. Atlas Excavating,* 2006 WL 3542332, *8 (N.D. Ill. 2006); *MCI WorldCom Network Services v. Kramer Tree Specialists,* 2003 WL 22139794, *3 (III) (N.D. Ill. 2003).

The Supreme Court of Virginia in *MCI WorldCom Network Services v. OSP Consultants,* 585 SE2d 540 (Va. 2003), held that MCI was not entitled to loss of use damages in a situation very similar to the present one. The Virginia court relied upon *Brooklyn Eastern Dist. Terminal v. United States,* 287 U. S. 170 (53 SC 103, 77 LE 240)

(1932), in which Brooklyn Terminal, after one of its tugboats was rendered temporarily useless after a collision with a United States vessel, worked its remaining tugs overtime at little or no cost rather than hire a substitute tug. The Supreme Court of the United States distinguished the *Brooklyn Eastern* case from the previous "spare boat" cases, which held that shipowners who use a spare boat that is kept in reserve for emergency purposes may recover loss of use damages based upon the reasonable rental value even though no substitute boat was actually rented. *Brooklyn Eastern Dist. Terminal v. United States*, supra at 176. The Supreme Court stated that "there has been a refusal to extend the [spare boat] doctrine to boats acquired and maintained for the general uses of the business." *Brooklyn Eastern Dist. Terminal v. United States*, supra at 177. According to the Supreme Court,

> [t]he question narrows itself to this, whether the full-time hire of an extra boat must be charged to the respondent as damage flowing from the collision when there was no need of such a boat to keep the business going, and none in fact was used or paid for. Is an award upon that basis either erroneous in law or extravagant in fact? Erroneous and extravagant we think it must be held to be. . . . Demurrage on the basis of the cost of a substitute, actual or supposititious, may be no more than fair indemnity when gains have been lost or enjoyment seriously disturbed. Demurrage on a like basis may be so extravagant as to outrun the bounds of reason when loss of profit has been avoided without the hire of a substitute and the disturbance of enjoyment has been slight or perhaps fanciful. . . .

*Brooklyn Eastern Dist. Terminal v. United States*, supra at 174, 176. The *Brooklyn Eastern* case supports a rule that loss of use damages cannot be "measured by expenses that in fact never were incurred, but that might have been incurred and charged to the [defendant] if the necessities of the business had been something other than they were." *Brooklyn Eastern Dist. Terminal v. United States*, supra at 173. In the present case, MCI's spare restorative capacity is more akin to *Brooklyn Terminal* requiring its existing tugs to work overtime, as the spare capacity is used by MCI in its general course of business. Unlike in the spare boat cases, MCI does not reserve particular cables for use exclusively in emergencies, and every cable is working at all times with each having extra capacity to handle the traffic that may be rerouted due to the failure of another. Thus, in direct opposition to Justice Cardozo's opinion in *Brooklyn Terminal*,

MCI is essentially trying to recover for expenses that were never incurred due to a redundant system that is necessary for a successful telecommunications business.

In its opinion, the dissent misconstrues this opinion and the facts of the case. Contrary to the dissent's assertion, we never state that the rerouting of the calls at the time the cable was severed functioned "seamlessly." We acknowledge that there was an interruption of services causing thousands of blocked calls and hundreds of complaints. However, as the system was only momentarily interrupted, any loss of use damages that may have accrued due to the need of hiring a substitute cable were nominal. In any event, even if some customers were without service for the duration of the repairs, MCI must still show some kind of resulting damage, such as customers who left MCI's service or refunds given to customers for the hours they had no service. Otherwise, MCI cannot prove damages from the loss of use of the severed cable because, as the cable's value hinges totally on its revenue-generating utility, MCI cannot show that it lost profits or would have made more profits if the cable had never been severed. The dissent and MCI contend that loss of use damages are appropriate in this case because the service disruption harmed MCI's business reputation. However, pretermitting whether there was sufficient evidence of such harm to MCI's business reputation, the appropriate measure of such damages is not the theoretical rental value of a substitute fiber-optic cable. Thus, our conclusion is merely that the damages argued by MCI are not in the character of loss of use damages that can be measured by a theoretical rental rate of substitute property.

By analogizing the present case to a fleet of taxis, the dissent overlooks basic facts and does not address our argument clearly made above. To reiterate, we do not challenge the assertion that the owner of a damaged taxi put out of use may recover for its loss of use measured by the rental value of a substitute taxi. The taxi, as the entire unit, has been placed out of use. In contrast, MCI's telecommunications system, which is the entire unit in the present case, was, absent a momentary interruption, not placed out of use, even during the repair of the severed cable. Thus, the two factual situations are not analogous. Moreover, the dissent, by conditioning the cab company's ability to recover loss of use damages on whether "the remaining cabs are incapable of increasing their capacities to cover the loss" of the damaged cab, acknowledges that loss of use damages are not automatically recoverable if there has been no injury.

In addition, the dissent relies primarily on the Restatement (Second) of Torts § 931 while only vaguely addressing the vast amount of Georgia law that requires actual loss of use damages in

order to receive compensation therefor. What the dissent does not recognize is that this opinion is consistent with § 931. That section states that loss of use "damages include compensation for . . . the value of the use during the period of detention or prevention *or* the value of the use of or the amount paid for a substitute. . . ." (Emphasis supplied.) We have not held that MCI was precluded from the outset from seeking loss of use damages. We simply state that MCI cannot measure such damages by using the theoretical rental value of a hired substitute. MCI could have submitted other evidence regarding "the value of the use," including such evidence as extra wear and tear on the working cables or loss of profits resulting from the diminished capacity of the system. See *MCI WorldCom Network Services v. Lind,* supra (citing various courts from other states that have adopted Restatement of Torts § 931 and allow alternative methods of calculating loss of use damages). Although comment b to § 931 can be read as requiring that loss of use damages be measured by the rental value of the chattel, this reading would be in direct contrast with, and thus not supported by, the actual text of § 931. Finally, we observe that all of the courts cited above which concluded that MCI, in similar circumstances, could not seek loss of use damages measured by the theoretical rental rate of substitute property are in states that have either specifically adopted the Restatement (Second) of Torts § 931, *Young v. M-C Co.,* 37 Va. Cir. 204 (3) (Va. Cir. Ct. 1995); *Kruvant v. 12-22 Woodland Ave. Corp.,* 350 A2d 102, 115 (N.J. Super. Law Div. 1975); *Meakin v. Dreier,* 209 S2d 252, 254 (Fla. Dist. Ct. App. 1968), or have relied on the Restatement (Second) of Torts and its comments in other contexts. *Gentry v. Craycraft,* 802 NE2d 1116, 1119 (Ohio 2004); *Yates v. Johnson County Bd. of Commissioners,* 888 NE2d 842, 849 (I) (Ind. Ct. App. 2008). We note that, although we have found persuasive support in other sections of the Restatement (Second) of Torts, we have not specifically adopted § 931. Thus, in short, the vast amount of persuasive authority, including the cases cited above that are directly on point, far outweigh the dissent's questionable interpretation of a comment in the Restatement.

Again, we emphasize that we do not conclude that MCI suffered no damages from the severance of its cable. The repair costs of the severed cable are rightly compensable. Moreover, other damages, if proven, would be compensable. For example, "[a]s Justice Cardozo pointed out, had the tugboat operator in *Brooklyn Terminal* been able to document overtime wages or 'extra wear and tear' on the undamaged tugs, those damages would have been recoverable." *Kuwait Airways Corp. v. Ogden Allied Aviation Services,* 726 FSupp. 1389, 1397 (IV) (E.D.N.Y. 1989). "[H]ad MCI shown 'extra wear and tear' [or lost earnings] on the undamaged cables, it would have been able to

recover those damages as loss of use." *MCI WorldCom Network Services v. Lind,* supra at *4 (3). We merely hold that, although MCI did suffer a loss of use of its cable, it has not shown sufficient proof of loss of use damages and, in any event, the proper measure of loss of use damages in the present context is not the theoretical rental value of a fiber-optic cable in a market that does not exist.

In summation, we conclude that a telecommunications carrier is not entitled to loss of use damages measured by the hypothetical cost to rent a replacement system where it suffered no actual loss of use damages and did not need to rent a replacement system because it was able to reroute calls within the existing redundant cable system the carrier necessarily installed in order to operate its business.

*Certified question answered. All the Justices concur, except Hunstein, P. J., Melton and Nahmias, JJ., who dissent.*

MELTON, Justice, dissenting.

Without authority, CMES, Inc. sliced through an underground fiber-optic cable owned by MCI, causing hundreds of thousands of phone calls to be blocked and an almost nine-hour disruption of service for a majority percentage of customers who relied on the spliced cable until it could be repaired. Had MCI not had backup lines in place to mitigate, but not eliminate, the loss of the cable, the damage would have been far greater. It is undisputed that, even with MCI's backup lines, its network could not provide seamless coverage for all affected users during repair of its damaged cable. Under these circumstances, both common sense and general fairness would indicate that MCI should be entitled to loss of use damages for its severed line. Georgia law and the Restatement of Torts indicate the same. Therefore, I respectfully dissent.

As the majority points out, loss of use damages have long been approved in Georgia. For example, in *Appling Motors, Inc. v. Todd,* 143 Ga. App. 644 (239 SE2d 537) (1977), an owner of a damaged corn combine was allowed to seek loss of use damages based on a substitute combine's rental value. In *Apostle v. Prince,* 158 Ga. App. 56 (279 SE2d 304) (1981), it was determined that the owner of a wrecked automobile was entitled to seek loss of use damages equivalent to the reasonable rental value of a comparable car. Likewise, in *Southern Crate & Veneer Co. v. McDowell,* 163 Ga. App. 153 (293 SE2d 541) (1982), the owner of a damaged pulpwooder was allowed to seek loss of use damages, even after the owner temporarily replaced the pulpwooder with a smaller truck in his fleet.

The Second Restatement of Torts supports these results. Generally, Section 931 (Detention Or Preventing Use Of Land Or Chattels)

provides:

> If one is entitled to a judgment for the detention of, or for preventing the use of, land or chattels, the damages include compensation for (a) the value of the use during the period of detention or prevention or the value of the use of or the amount paid for a substitute, and (b) harm to the subject matter or other harm of which the detention is the legal cause.

The comments further explain:

> b. The owner of the subject matter is entitled to recover as damages for the loss of the value of the use, at least the rental value of the chattel or land during the period of deprivation. This is true even though the owner in fact has suffered no harm through the deprivation, as when he was not using the subject matter at the time or had a substitute that he used without additional expense to him. The use to which the chattel or land is commonly put and the time of year in which the detention or deprivation occurs are, however, to be taken into consideration as far as these factors bear upon the value of the use to the owner or the rental value.
> c. Use of substitute. If a person has been deprived of a chattel or land that was being used in a business that would suffer from the deprivation, the rule for avoidable consequences (see § 918) requires that he should make reasonable efforts to procure a substitute to prevent the harm. If he uses a substitute of his own, he is entitled to its reasonable rental value in substitution for the rental value of that of which he was deprived. This is true although its rental value is greater than that of the thing for which it was substituted, unless a cheaper substitute could have been procured or unless the value is greater than the harm that would have been suffered without a substitute. The same rule applies when a substitute is obtained from a third person. The injured person is entitled to indemnity for the amount paid for its use even though this is greater than its reasonable rental value, if there is no alternative except still greater harm to the business.

Based on this case law and the Restatement, it becomes clear that, contrary to the opinion of the majority, MCI may pursue

loss of use damages in this case. MCI lost use of its cable, was required to use a substitute to restore capacity, and is entitled to the fair rental value of that substitute. This value may easily be calculated. The evidence showed that substitute capacity for damaged fiber-optic cables may be rented on a 30-day basis. The rental rate for 30 days may then be prorated to arrive at an hourly rental rate, which can then be used to determine the fair rental rate for MCI's nine-hour loss of its cable.

The majority reaches the opposite conclusion by making three fundamental errors. First, it misconstrues the applicable cases cited above by arguing that a fiber-optic cable cannot be analogized to vehicles because it is part of an integrated network that at all times remained in use. This is illogical. For example, if one taxi in a fleet of taxis is damaged, the remaining cabs in the "network" may continue to be used while the single cab is repaired. Assuming that the remaining cabs are incapable of increasing their capacities to cover the loss, the cab company has been damaged by a diminished capacity to perform the functions for which it is in business and should not be prevented from seeking recompense for this damage.

Second, the majority bases its conclusion on the premise that, due to the re-routing of lines, MCI's network worked "seamlessly." That is not the case. Although re-routing mitigated the damage, a large percentage of MCI's customers who relied on the spliced cable had their services interrupted until the cable was put back into use. In short, the damage was mitigated, not eliminated as the majority implies. Therefore, the majority's reliance on *Brooklyn Eastern Dist. Terminal v. United States*, 287 U. S. 170 (53 SC 103, 77 LE 240) (1932), is misplaced. Unlike the tugboat company in that case which was able to use its existing boats overtime to keep its business at a normal level after one tug was damaged, MCI was not able to use its existing redundant lines to restore its network to normal levels of functionality.

For a similar reason, the majority's analogy to a single twin engine plane is misplaced. Properly adjusted to the facts of this case, the proper scenario would be one in which an airline owns one passenger plane with ten seats and one with five seats. The ten-seat plane is used on a daily basis, and the five-seat plane is held in a warehouse only as backup. If, perhaps, a loading truck owned by a separate company crashed into the ten-seat plane negligently and grounded it, the airline could turn to the five-seat plane to mitigate its damages. Nonetheless, assuming full flights, it would lose half of its revenue. It could still perform its function, flying passengers, but it could not perform at its full and usual capacity. As a result, the airline would most certainly be entitled to loss of use damages, just as MCI

should be entitled to damages for the reduction in capacity for the nine hours of the outage. Again, MCI's damage was only mitigated, not eliminated.

Third, the majority ignores the Restatement altogether. This is likely because the majority's opinion is directly contrary to the analysis the Restatement presents. For these reasons, the majority's analysis is incomplete and incorrect in spite of its otherwise complexity.

Accordingly, I believe that MCI may seek loss of use damages in this case.

I am authorized to state that Presiding Justice Hunstein and Justice Nahmias concur in this opinion.

DECIDED JUNE 18, 2012 —
RECONSIDERATION DENIED JULY 26, 2012.

*Elarbee, Thompson, Sapp & Wilson, Brent L. Wilson, William D. Deveney, Hall, Estill, Hardwick, Gable, Golden & Nelson, Anthony J. Jorgensen, James J. Proszek*, for appellant.

*Hall, Booth, Smith & Slover, Jason P. King*, for appellee.